## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
### (Northern Division)

| | |
|---|---|
| GEORGE ASSAD,<br><br>               Plaintiff,<br><br>        v.<br><br>TWO HARBORS INVESTMENT CORP., STEPHEN G. KASNET, WILLIAM GREENBERG, E. SPENCER ABRAHAM, JAMES J. BENDER, SANJIV DAS, KAREN HAMMOND, JAMES A. STERN, and HOPE B. WOODHOUSE,<br><br>               Defendants. | Case No. 1:26-cv-1896-JRR |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

NATURE AND STAGE OF PROCEEDING ................................................................................ 1

LEGAL STANDARD AND ARGUMENT ................................................................................... 3

I.      THE TEMPORARY RESTRAINING ORDER AND PRELIMINARY
        INJUNCTION STANDARD ..................................................................................... 3

II.     PLAINTIFF IS LIKELY TO SUCCEED ON HIS EXCHANGE ACT CLAIMS ............. 3

        A.      Materiality Is the Lynchpin of Section 14(a) ........................................... 4

        B.      The Proxy Omits and Misstates Facts Material to the Stockholder Vote ............... 4

                1.      The Proxy Conceals UWMC's Allegation That Two Harbors
                        Breached the No-Shop Provision ................................................. 5

                2.      The Proxy Conceals Material Facts About Management's Economic
                        and Employment Interests .......................................................... 6

                3.      The Proxy Mischaracterizes the Doubling of the Termination Fee ............ 7

                4.      The Proxy Mischaracterizes the Board's Engagement With UWMC
                        ..................................................................................... 7

        C.      The Maryland Fiduciary Duty Claims Independently Support Injunctive
                Relief ..................................................................**Error! Bookmark not defined.**

III.    PLAINTIFF WILL SUFFER IRREPARABLE HARM ABSENT AN
        INJUNCTION ..................................................................................... 8

IV.     THE BALANCE OF HARDSHIPS WEIGHS IN PLAINTIFF'S FAVOR, AND
        AN INJUNCTION IS IN THE PUBLIC INTEREST ...................................... 9

V.      NO SECURITY IS NECESSARY ......................................................... 9

CONCLUSION ........................................................................................ 10

## NATURE AND STAGE OF PROCEEDING

Plaintiff George Assad brings this action individually under Sections 14(a) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78n(a) and 78t(a), and SEC Rule 14a-9, 17 C.F.R. § 240.14a-9 in connection with the proxy materials by which Two Harbors Investment Corp. ("Two Harbors" or the "Company") and its Board of Directors (the "Board") are soliciting stockholder approval of an all-cash merger with CrossCountry Intermediate Holdco, LLC ("CrossCountry" or "CCM") at $12.00 per share. The special meeting of Two Harbors stockholders is scheduled for May 19, 2026. Unlike the typical merger proxy lawsuit, the basis for asserting the falsity of the proxy om this case is a direct accusation by the CEO of a jilted corporate bidder of disloyal conduct and undisclosed self-interest by the defendant company's board and management.

Two Harbors is a Maryland-incorporated real estate investment trust whose common stock trades on the New York Stock Exchange under the ticker "TWO." On December 17, 2025, the Board signed an all-stock merger agreement with UWM Holdings Corporation ("UWMC") valued at $11.94 per share. That same day, the Board approved accelerated cash bonuses, accelerated vesting of restricted stock units, and a $3.5 million restricted stock award to Chief Executive Officer William Greenberg. On March 27, 2026, the Board terminated the UWMC merger agreement and executed an all-cash merger agreement with CrossCountry at a lower headline price of $10.80 per share. CrossCountry paid UWMC a $25.4 million termination fee.

Two Harbors filed its Definitive Proxy Statement on Schedule 14A with the SEC on April 20, 2026 (DEFM14A or the "Proxy"), and definitive additional proxy materials on May 4, 2026 and May 6, 2026 (the "DEFA14As," and together with the Proxy, the "Proxy Materials"). The Proxy Materials are the subject of this action. On the very day the Proxy was filed, UWMC delivered a revised, superior proposal at $11.30 per share in cash (uncapped, without proration) or

2.3328 shares of UWMC stock. CrossCountry then proposed a matching $11.30 amendment on April 27, 2026—but in exchange, the Board agreed to double the termination fee from $25.4 million to $50 million, providing no incremental value, certainty, or risk-shifting consideration. On April 30, 2026, UWMC raised its offer to $12.00 per share in cash and issued an open letter to stockholders accusing the Board of refusing to negotiate and accepting "the bare minimum to match." The Board rejected that proposal on May 3, 2026.

On May 6, 2026, UWMC's Chief Executive Officer disclosed on a public earnings call that the UWMC-Two Harbors merger was on track until Two Harbors management discovered that UWMC did not intend to retain them post-closing—whereupon management, he alleged, reversed course to favor CrossCountry for reasons of entrenchment. On May 8, 2026, the Board accepted a second bare-match amendment from CrossCountry at $12.00 per share, again with no incremental value. On May 11, 2026, UWMC publicly increased its cash election to $12.50 per share (uncapped, without proration) and published a second open letter alleging that the Board was protecting approximately $35 million in immediate management payouts.

Plaintiff filed the Complaint for violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9, and for breach of fiduciary duty under Maryland law, contemporaneously with this motion. The stockholder vote is a week away. Absent immediate injunctive relief, Plaintiff and his fellow Two Harbors stockholders will be forced to cast their votes on the basis of Proxy Materials that omit and mischaracterize material facts.

Plaintiff respectfully submits that the Court should grant a temporary restraining order and preliminary injunction: (i) enjoining Defendants from holding the May 19, 2026 special meeting; (ii) enjoining Defendants from soliciting or counting proxies in favor of the CrossCountry merger; and (iii) enjoining consummation of the CrossCountry merger until corrective disclosures are made

and Two Harbors stockholders have had not less than ten (10) business days to consider such

disclosures and change their votes.

<strong><u>LEGAL STANDARD AND ARGUMENT</u></strong>

**I.      THE      TEMPORARY      RESTRAINING      ORDER      AND      PRELIMINARY INJUNCTION STANDARD**

The purpose of a temporary restraining order and preliminary injunction is "to protect the

status quo and to prevent irreparable harm during the pendency of a lawsuit." *In re Microsoft Corp.*

*Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003). The Fourth Circuit applies a four-factor test

under Federal Rule of Civil Procedure 65, asking whether the movant has shown: (1) a likelihood

of success on the merits; (2) a likelihood of irreparable harm absent an injunction; (3) that the

balance of equities favors the movant; and (4) that an injunction is in the public interest. *League*

*of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014).

The Fourth Circuit applies a sliding-scale approach under which the strength of the

likelihood-of-success showing required is informed by the balance of hardships. *See Dan River,*

*Inc. v. Icahn*, 701 F.2d 278, 283 (4th Cir. 1983) ("[I]t is necessary to review the hardships facing

both parties which indicate that the balance does not tilt in Dan River's favor and that, accordingly,

a strong likelihood of success on the merits is necessary to justify the granting of the preliminary

injunction."). A plaintiff need only demonstrate a "better than negligible" chance of success on the

merits. *Domanus v. Lewicki*, 857 F. Supp. 2d 719, 724 (N.D. Ill. 2012). As demonstrated below,

Plaintiff meets all four factors for injunctive relief.

**II.     PLAINTIFF IS LIKELY TO SUCCEED ON HIS EXCHANGE ACT CLAIMS**

Section 14(a) of the Exchange Act and SEC Rule 14a-9 prohibit the solicitation of proxies

by means of any proxy statement that contains false or misleading statements of material fact or

that omits material facts necessary to make the statements made not false or misleading. 15 U.S.C.

3

§ 78n(a); 17 C.F.R. § 240.14a-9. To establish a Section 14(a) claim, a plaintiff must show that (1) the proxy statement contained a material misstatement or omission, (2) the defendant was at least negligent, and (3) that the proxy solicitation was an essential link in the accomplishment of the transaction. *Lone Star Steakhouse & Saloon, Inc. v. Adams*, 148 F. Supp. 2d 1141, 1151 (D. Kan. 2001).

Section 14(a) imposes a negligence standard; scienter is not required. *Brown v. Brewer*, No. CV06-3731-GHK (SHx), 2010 WL 2472182, at *24–25 (C.D. Cal. June 17, 2010). Where, as here, stockholder approval is required to consummate the transaction and is being solicited by the proxy statement at issue, the "essential link" element is established as a matter of law. *Brown v. Brewer*, No. CV06-3731-GHK (JTLx), 2008 WL 6170885, at *5 (C.D. Cal. Jul. 14, 2008). Section 20(a) imposes derivative liability on any person who controls another person liable under Section 14(a). 15 U.S.C. § 78t(a). Each member of the Board reviewed and authorized the Proxy Materials and is therefore a controlling person within the meaning of the statute.

### A.     Materiality Is the Lynchpin of Section 14(a)

The Supreme Court has defined the standard for materiality under the proxy rules: an omitted fact is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). Put differently, an omitted fact is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* Materiality is assessed from the perspective of the reasonable stockholder—not the board whose solicitation is at issue.

### B.     The Proxy Omits and Misstates Facts Material to the Stockholder Vote

The Proxy Materials contain four categories of omissions and misstatements that, individually and collectively, render them materially misleading. Each concerns information that

a reasonable Two Harbors stockholder would consider important in deciding whether to vote for the CrossCountry merger or to preserve the ability to vote on, or tender into, UWMC's publicly disclosed superior $12.50 per share proposal. *See TSC Indus.*, 426 U.S. at 449.

### 1.    The Proxy Conceals UWMC's ssertionMay Have Assertion That Two Harbors MayBreached the No-Shop Provision

On May 6, 2026, UWMC's Chief Executive Officer disclosed on a public earnings call that the Two Harbors management team changed course and turned to CrossCountry only after management realized that UWMC did not intend to retain them post-closing. Specifically, when asked blank, he said, blank about UWMC's loss of the Two Harbors deal, UWMC's CEO stated that "we don't see as much value in their management team" and "their leadership team we were not as impressed with." He continued: "[S]ince then is they've went out and tried to get another bid, and they did. Whether it was appropriate or not, we can discuss that at a later point."

UWMC's CEO thus alleged—publicly, on an SEC-regulated earnings call—that Two Harbors may have breached Section 6.3 of the Original UWMC Merger Agreement, the provision prohibiting Two Harbors from inviting or soliciting competing offers (the "No-Shop").

The Proxy is silent on this risk, which might even affect the Company's ability to close a deal with CrossCountry—a risk that itself could jeopardize Two Harbors' transaction with CrossCountry. The Proxy does not disclose that UWMC's CEO publicly accused the Company of improperly soliciting CrossCountry in derogation of the No-Shop. It does not disclose that Two Harbors faces potential liability to UWMC arising from such a breach. It does not disclose how the Board or its advisors evaluated the merits of UWMC's allegation. A reasonable stockholder deciding how to vote on the CrossCountry merger would consider it important to know that the counterparty to the prior, higher-valued merger agreement has publicly alleged that the current deal originated in breach of that agreement.

This omission is material on any fair reading of *TSC Industries*. It bears directly on: (i) the legitimacy of the process that produced the CrossCountry transaction; (ii) the existence of potential contingent liabilities that will attach to the surviving entity: and (iii) the credibility of the Board's representation that UWMC's competing proposals were rejected on the merits rather than for management-protective reasons.

> **2.    The Proxy Conceals Material Facts About Management's Economic and Employment Interests**

On the same day the Board signed the original UWMC merger agreement—December 17, 2025—the Board approved accelerated cash bonuses, accelerated vesting of restricted stock units, and a $3.5 million restricted stock award to Chief Executive Officer Greenberg. Whether the Board's fiduciaries retain their jobs and economic upside going forward differs sharply as between the CrossCountry and UWMC transactions. Under the CrossCountry all-cash structure, management's equity awards vest and convert to cash at closing, generating an immediate payout. Under the UWMC stock-for-stock structure, existing awards would, per customary practice, be rolled or replaced with post-closing awards tied to continued employment—with UWMC free to decline continued employment.

The Proxy does not disclose: (i) whether any director or officer has received or negotiated for a post-closing role under CrossCountry; (ii) the $35 million figure UWMC has publicly identified as the aggregate amount of immediate management payouts accelerated by the CrossCountry deal; or (iii) the significance of the asymmetry between accelerated cash payouts under CrossCountry and the possibility that UWMC would not extend replacement awards.

Where, as here, management's personal financial interest and continued employment are aligned with one deal structure but not the other, federal law requires disclosure of those facts so the stockholders who bear the ultimate vote can assess the Board's process for conflict. *Lone Star*

*Steakhouse*, 148 F. Supp. 2d at 1152–53 (ordering corrective disclosure of material facts regarding management conflicts).

### 3. The Proxy Mischaracterizes the Doubling of the Termination Fee

On April 27, 2026, CrossCountry proposed to match UWMC's $11.30 cash proposal. The following day, the Board approved a First Amendment increasing CrossCountry's price to $11.30—and, in the same stroke, doubled the termination fee payable to CrossCountry from $25.4 million to $50 million. The Proxy presents this amendment as a routine, value-maximizing exercise. It is not. CrossCountry offered no incremental value above UWMC's $11.30 number; CrossCountry offered no additional closing certainty; CrossCountry offered no reduction in financing risk; CrossCountry offered no improved regulatory posture. In exchange for a bare match, the Board inflated the very deal-protection device designed to deter further competition.

A reasonable stockholder would consider the economic logic of doubling a termination fee—an act that directly increases the cost to any superior bidder—important to her assessment of whether the Board discharged its duty to maximize value. By characterizing the First Amendment as an ordinary business-judgment improvement rather than an asymmetric deal-protection giveaway, the Proxy Materials render the total mix of information materially misleading.

### 4. The Proxy Mischaracterizes the Board's Engagement With UWMC

The Proxy describes the Board's interactions with UWMC between April 20 and May 3, 2026 as "thorough" and "exhaustive." The record belies that description. The Board made zero counterproposals to UWMC. The Board never asked UWMC to modify the default-consideration structure, to eliminate the cap on the cash election, to alter the proration mechanics, or to address financing or regulatory timing. In its open letters of April 30 and May 11, UWMC has publicly disputed the Board's characterization of this engagement.

7

A proxy statement that characterizes a board's process as "thorough" when the board in fact declined to counter, negotiate, or engage on the terms separating the two deals is materially misleading under Section 14(a). The misstatement is particularly acute here because the Board has emphasized the purported thoroughness of its process as the principal ground for recommending the lower-priced, management-friendlier CrossCountry transaction.

## III.     PLAINTIFF WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION

Courts uniformly recognize that the prospect of a stockholder vote on incomplete or misleading disclosures constitutes irreparable harm warranting injunctive relief. *See Allergan, Inc. v. Valeant Pharms. Int'l, Inc.*, No. SACV 14-1214 DOC(ANx), 2014 WL 5604539, at *16 (C.D. Cal. Nov. 4, 2014) ("An uninformed shareholder vote is often considered an irreparable harm, particularly because the raison d'etre of many of the securities laws is to ensure that shareholders make informed decisions."); *Lone Star Steakhouse*, 148 F. Supp. 2d at 1150 ("Monetary damages cannot restore the right of shareholders to effectively exercise their corporate suffrage rights.").

The Fourth Circuit applies the same principle in the proxy context. *See Dan River, Inc. v. Unitex, Ltd.*, 624 F.2d 1216, 1227 (4th Cir. 1980) (recognizing the need for accurate SEC filings to enable informed stockholder decision-making). A stockholder who votes on the basis of an incomplete proxy—particularly where the vote authorizes the irreversible exchange of her equity for cash—cannot be made whole by monetary damages after the fact. The May 19 special meeting will, if allowed to proceed, consummate a cash-out merger that permanently extinguishes Mr. Assad's equity interest in Two Harbors. The harm is quintessentially irreparable.

The irreparable harm here is particularly acute. UWMC has publicly offered $12.50 per share in cash (uncapped and not subject to proration), a price $0.50 higher than CrossCountry's $12.00 matching proposal. If the May 19 vote proceeds on the basis of the current, materially misleading Proxy Materials, Two Harbors stockholders, including Mr. Assad, will cast their votes

8

without material information bearing directly on the Board's recommendation—and Mr. Assad will be permanently cashed out at the inferior price.

## IV.   THE BALANCE OF HARDSHIPS WEIGHS IN PLAINTIFF'S FAVOR, AND AN INJUNCTION IS IN THE PUBLIC INTEREST

The balance of hardships tips decidedly in Plaintiff's favor. Defendants will suffer no cognizable hardship from a brief delay sufficient to make corrective disclosures and afford stockholders a reasonable period to consider them. *See Mid-Continent Bancshares, Inc. v. O'Brien*, No. 81-1395-C, 1981 WL 1404, at \*12 (E.D. Mo. Dec. 11, 1981) (granting preliminary injunction requiring corrective disclosures and finding defendants would suffer no significant harm from injunctive relief).

The public interest weighs strongly in the same direction. The purpose of Section 14(a) is "to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation." *J.I. Case Co. v. Borak*, 377 U.S. 426, 431 (1964). Enforcing the federal disclosure regime so that stockholders may vote on a fully informed basis squarely advances the public interest. *Allergan*, 2014 WL 5604539, at \*16 ("An injunction ordering corrective disclosures is also in the public interest, as it prevents an uninformed shareholder vote.").

## V.   NO SECURITY IS NECESSARY

Although Federal Rule of Civil Procedure 65(c) provides that security may be required before a preliminary injunction issues, the Fourth Circuit has confirmed that "the district court retains the discretion to set the bond amount as it sees fit or waive the security requirement." *Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013); *see also Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999). Where, as here, injunctive relief vindicates the federal

securities laws and protects public stockholders from an uninformed vote, courts routinely set bond at zero or a nominal amount. No bond should be required.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court enter a temporary restraining order and preliminary injunction (i) enjoining Defendants from holding the May 19, 2026 special meeting of Two Harbors stockholders, (ii) enjoining Defendants from soliciting or counting proxies in favor of the CrossCountry merger, and (iii) enjoining consummation of the CrossCountry merger until Defendants make the supplemental corrective disclosures identified herein and Two Harbors stockholders have had not less than ten (10) business days to consider such disclosures and, if they wish, to change their votes. Plaintiff further requests that the Court require no bond as a condition of injunctive relief.

Dated: May 13, 2026

Respectfully submitted,

*/s/ Cyril V. Smith*
Cyril V. Smith (Fed Bar. No. 07332)
Aaron S.J. Zelinsky
ZUCKERMAN SPAEDER LLP
100 East Pratt Street - Suite 2440
Baltimore, MD 21202-1031
Tel. (410) 332-0444
Fax (410) 659-0436
csmith@zuckerman.com
azelinsky@zuckerman.com

*Of Counsel*:
**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
Mark Lebovitch (*PHV forthcoming*)
1251 Avenue of the Americas
New York, NY 10020
Tel. (212) 554-1400
markl@blbglaw.com

Alexander Rigby

10

500 Delaware Avenue - Suite 900
Wilmington, DE 19801
Tel. (302) 690-3793
alexander.rigby@blbglaw.com
*Attorneys for Plaintiff*

11