**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Northern Division)**

| | |
|---|---|
| **GEORGE ASSAD,** )<br> )<br>**Plaintiff,** )<br> )<br>   **v.** )<br> )<br>**TWO HARBORS INVESTMENT** )<br>**CORPORATION,** *et al.,* )<br> )<br>**Defendants.** )<br>_____ ) | **Civil Action No. 1:26-cv-01896-JRR** |

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR A**
**TEMPORARY RESTRAINING ORDER**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ........................................................................................................................ 1

FACTUAL AND PROCEDURAL BACKGROUND................................................................... 3

    A.    Relevant Entities ..................................................................................................... 3

    B.    The Sale Process .................................................................................................... 4

    C.    This Litigation...................................................................................................... 13

LEGAL STANDARD............................................................................................................... 14

ARGUMENT ............................................................................................................................ 14

    I.    Plaintiff's Motion Should Be Denied Because Plaintiff Cannot Satisfy the High Standard for His Requested Relief. ............................................................. 15

        A.    Plaintiff Has No Likelihood of Success on the Merits. ........................... 15

            1.    The Proxy Statements Did Not Omit or Misrepresent Any Information. ................................................................................ 17

            2.    Even if Plaintiff's Alleged Misrepresentations or Omissions Were Actionable, the Disclosure of the Complaint and Competing Proxy Now Require Dismissal. ................................. 23

        B.    Plaintiff Cannot Demonstrate Irreparable Harm...................................... 25

        C.    The Balance of Equities Favors Defendants, Not Plaintiff...................... 27

        D.    Enjoining the Shareholder Vote Would Not Be Consistent with the Public Interest. ....................................................................................... 28

        II.    A Bond Should Be Required................................................................... 28

CONCLUSION......................................................................................................................... 30

# TABLE OF AUTHORITIES

**Page**

CASES

*Allergan, Inc. v. Valeant Pharms. Int'l, Inc.*,
2014 WL 5604539 (C.D. Cal. Nov. 4, 2014).................................................................27, 28

*Beck v. Dobrowski*,
559 F.3d 680, 686 (7th Cir. 2009) ......................................................................... 25

*Bertoglio v. Texas Int'l Co.*,
488 F. Supp. 630 (D. Del. 1980).............................................................................22

*Bolger v. First State Fin. Servs.*,
759 F. Supp. 182 (D.N.J. 1991) ........................................................................18, 24

*Calleros v. FSI Int'l, Inc.*,
892 F. Supp. 2d 1163 (D. Minn. 2012)....................................................................27

*Cytimmune Scis., Inc. v. Paciotti*,
2016 WL 4699417 (D. Md. Sept. 8, 2016) ..............................................................14

*Dan River, Inc. v. Unitex Ltd.*,
624 F.2d 1216 (4th Cir. 1980) ...............................................................................27

*Direx Israel, Ltd. v. Breakthrough Med. Corp.*,
952 F.2d 802 (4th Cir. 1991) .................................................................................14

*Erickson v. Hutchinson Tech. Inc.*,
158 F. Supp. 3d 751, 760 (D. Minn. 2016).............................................................26

*Freer v. Mayer*,
796 F. Supp. 89 (S.D.N.Y. 1992) ........................................................................ 19

*Galaton v. Johnson*,
2011 WL 9688271 (E.D.N.C. Aug. 17, 2011).......................................................1, 2

*Gilead Scis., Inc. v. Meritain Health, Inc.*,
2025 WL 1745669 (D. Md. June 24, 2025) (Rubin, J.).......................................14, 26

*Gimbel v. Signal Cos., Inc.*,
316 A.2d 599 (Del. Ch. 1974)............................................................................... 30

*Hayes v. Crown Cent. Petroleum Corp.*,
　78 F. App'x 857 (4th Cir. 2003) .................................................................. 15, 16, 18

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*,
　174 F.3d 411 (4th Cir. 1999) ..................................................................................29, 30

*In re Browning-Ferris Indus., Inc. S'holder Derivative Litig.*,
　830 F. Supp. 361 (S.D. Tex. 1993), *aff'd sub nom. Cohen v. Ruckelshaus*, 20
　F.3d 465 (5th Cir. 1994) .......................................................................................18

*In re Focus Fin. Partners*,
　2025 WL 961488 (D. Del. Mar. 31, 2025) ...............................................................23

*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*,
　543 F. Supp. 3d 96 (D. Md. 2021), *aff'd sub nom. In re Marriott Int'l, Inc.*, 31
　F.4th 898 (4th Cir. 2022) .................................................................................... 23

*In re Siliconix Inc. S'holders Litig.*,
　2001 WL 716787 (Del. Ch. June 19, 2001)..............................................................22

*In re Walgreen Co. Stockholder Litig.*,
　832 F.3d 718 (7th Cir. 2016) ..................................................................................2

*In re Willis Towers Watson*
　*plc Proxy Litig.*, 937 F.3d 297, 306 (4th Cir. 2019) ................................................ 16

*Johnson as Tr. of Johnson Fam. Tr. v. Saba Cap. Mgmt., L.P.*,
　2023 WL 1345717 (S.D.N.Y. Jan. 31, 2023) ..........................................................27

*Kahn v. Wien*,
　842 F. Supp. 667 (E.D.N.Y.), *aff'd*, 41 F.3d 1501 (2d Cir. 1994).........................22

*Kugelman v. PVF Capital Corp.*,
　972 F. Supp. 2d 993 (N.D. Ohio 2013)...................................................................17

*Land & Buildings Inv. Mgmt., LLC v. Taubman Centers, Inc.*,
　2017 WL 3499900 (E.D. Mich. Aug. 16, 2017), *aff'd*, 751 Fed. App'x 612
　(6th Cir. 2018).........................................................................................................24

*Lessler v. Little*,
　857 F.2d 866 (1st Cir. 1988).................................................................................24

*Litwin v. OceanFreight, Inc.*,

865 F. Supp. 2d 385, 395 (S.D.N.Y. 2011)..................................................................25

*Lone Star Steakhouse & Saloon, Inc. v. Adams*,
148 F. Supp. 2d 1141 (D. Kan. 2001)..............................................................21, 28

*Maages Auditorium v. Prince George's Cnty., Md.*,
4 F. Supp. 3d 752 (D. Md. 2014), *aff'd sub nom. Maages Auditorium v. Prince
George's Cnty., Maryland*, 681 F. App'x 256 (4th Cir. 2017) .................................14

*Mach. Sols., Inc. v. Doosan Corp.*,
2015 WL 5554357 (D.S.C. Sept. 18, 2015)..............................................................27

*Malon v. Franklin Fin. Corp.*,
2014 WL 6791611 (E.D. Va. Dec. 2, 2014) ...............................................2, 16, 26

*Marshall v. HCSB Fin. Corp.*,
2017 WL 3130479 (D.S.C. July 24, 2017) .................................................................2

*Mendell v. Greenberg*,
927 F.2d 667 (2d Cir.), *amended*, 938 F.2d 1528 (2d Cir. 1990) ....................19, 22

*MicroStrategy Inc. v. Motorola, Inc.*,
245 F.3d 335 (4th Cir. 1991) ....................................................................................14

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015)..................................................................................................23

*Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*,
2018 WL 1535496 (D. Md. Mar. 28, 2018), *aff'd*, 918 F.3d 312 (4th Cir.
2019) .........................................................................................................................16

*Pashby v. Delia*,
709 F.3d 307 (4th Cir. 2013) ....................................................................................30

*Real Truth About Obama, Inc. v. Fed. Election Comm'n*,
575 F.3d 342 (4th Cir. 2009), *cert. granted, judgment vacated*, 559 U.S. 1089
(2010).........................................................................................................................14

*Ryan v. CHA Enters., Inc.*,
1990 WL 58969 (S.D.N.Y. May 1, 1990) .................................................................27

*Savoy v. Bos. Priv. Fin. Holdings, Inc.*,
626 F. Supp. 3d 242 (D. Mass. 2022) .......................................................................23

*Shepard v. Meridian Ins. Grp., Inc.*,
　　137 F. Supp. 2d 1096 (S.D. Ind. 2001) ...............................................................30

*Stein v. Almost Family, Inc.*,
　　2018 WL 1440841 (W.D. Ky. Mar. 22, 2018) ...............................................28, 29

*Svezzese v. Duratek, Inc.*,
　　67 Fed. App'x 169 (4th Cir. 2003) .....................................................................17

*Tate & Lye PLC v. Staley Cont'l, Inc.*,
　　1988 Del. Ch. LEXIS 61 (Del. Ch. May 9, 1988) ..............................................30

*Topley v. SemGroup Corp.*,
　　2021 WL 1172622 (S.D.N.Y. Mar. 29, 2021) ....................................................25

*TSC Indus., Inc. v. Northway, Inc.*,
　　426 U.S. 438 (1976).......................................................................................15, 18

*United States v. Matthews*,
　　787 F.2d 38 (2d Cir. 1986)..................................................................................18

*United States v. Simmons*,
　　11 F.4th 239 (4th Cir. 2021) ...............................................................................30

*Virginia Bankshares, Inc. v. Sandberg*,
　　501 U.S. 1083 (1991)...........................................................................................18

*Winter v. Natural Res. Def. Council, Inc.*,
　　555 U.S. 7 (2008).........................................................................................14, 25

**STATUTES**

15 U.S.C. § 78n(a) ....................................................................................................13

15 U.S.C. § 78u-4(b)(1) ............................................................................................ 14

Securities and Exchange Act of 1934 § 14(a)........................................................ passim

Securities and Exchange Act § 20(a) ............................................................... 1, 13, 17

**RULES**

17 C.F.R. § 240.14a-9............................................................................................ passim

Federal Rule of Civil Procedure 65(c) ........................................................................................28, 29

Defendants respectfully submit this opposition to Plaintiff's motion for a temporary restraining order.[1]

## INTRODUCTION

A mere six (6) days before the scheduled May 19, 2026 shareholder meeting, Plaintiff, a single shareholder allegedly owning stock in Two Harbors Investment Corp. ("TWO"), asks this Court to enjoin TWO's shareholders from voting on a planned transaction between TWO and CrossCountry Intermediate Holdco, LLC ("CrossCountry" or "CCM").  Plaintiff's claims are premised on his allegation that TWO omitted or misrepresented statements in its public proxy filings related to the CCM transaction and a prior competing bid issued by UWMC Holdings Corporation ("UWMC"), thereby violating Sections 14(a) and 20(a) of the Securities and Exchange Act of 1934 and SEC Rule 14a-9.  Specifically, in his Motion for a Temporary Restraining Order and Preliminary Injunction, Plaintiff alleges that despite filing almost 300 pages of materials, TWO somehow failed to disclose four categories of information related to UWMC's prior offer, the Board's engagement with UWMC, management's economic and employment interests in the CCM transaction, and the increase of a termination fee that the Board negotiated—adopting an incorrect version of the facts and subjective opinions of the CEO of a disgruntled bidder.  Instead of confirming that Defendants had in fact disclosed the necessary information in the various proxy filings, Plaintiff waited until the "fifty-ninth minute of the eleventh hour," *Galaton v. Johnson*, 2011 WL 9688271, at *2 (E.D.N.C. Aug. 17, 2011), to pursue meritless claims and seek expedited relief.

This case follows a familiar lawyer-driven playbook.  Defendants announce a planned

---

[1] If the Court denies the temporary restraining notice, Defendants respectfully request the opportunity to brief Plaintiff's separate request for a preliminary injunction as contemplated by the Court's order dated May 14, 2026.

transaction and file a related proxy statement, and on the eve of a scheduled shareholder vote, Plaintiff and his counsel manufacture an emergency by filing a complaint and seeking a motion for expedited relief—all in the hopes of stalling a deal and forcing a settlement for a few additional disclosures and a fee for Plaintiff's lawyers.  *See also In re Walgreen Co. S'holder Litig.*, 832 F.3d 718, 721, 721 (7th Cir. 2016) (recognizing national epidemic of litigation filed in wake of public-company merger announcements "for the sole purpose of obtaining fees for the plaintiffs' counsel" based upon threat of injunction).  Indeed, this is not the first time that Plaintiff has turned to the courts to air a shareholder grievance.  He has filed 35 securities claims and contractor shareholder suits over the last thirteen years.  He presumably thinks he can now extract a settlement by delaying the shareholder vote.  But courts see through this stratagem—they routinely deny emergency motions for relief in such circumstances*.  Marshall v. HCSB Fin. Corp.*, 2017 WL 3130479, at \*\*7-8 (D.S.C. July 24, 2017); *Malon v. Franklin Fin. Corp.*, 2014 WL 6791611, at \*\*1, 3, 10 (E.D. Va. Dec. 2, 2014); *Galaton*, 2011 WL 9688271, at \*1-2.  The same result is warranted here.

*First*, Plaintiff cannot show any likelihood that he will succeed on the merits of his claims. All of the alleged omissions and misrepresentations have already been disclosed or represent subjective beliefs that are not actionable.  Moreover, now that TWO has disclosed the Complaint and UWMC's competing proxy statement (which puts shareholders on notice of the same representations that Plaintiff claims TWO omitted or misrepresented), the case is moot and this Court must dismiss.

*Second*, Plaintiff has not made a clear showing of irreparable harm.  Plaintiff has offered no evidence of how the allegedly omitted or misrepresented information would inform his vote or why he does not have an adequate remedy at law.

2

*Third*, the balance of the equities strongly favors denying Plaintiff's Motion. The issuance of injunctive relief to buy time to litigate this case will cause substantial harm to TWO, its shareholders, and the counterparty to the transaction. Plaintiff, on the other hand, will suffer little harm in the unlikely event that a disclosure violation occurred and Plaintiff is compensated accordingly.

*Finally*, the public interest would be served by allowing the vote to proceed. As courts recognize, the public interest is served by allowing an arms-length merger to occur, rather than delaying the benefit because a shareholder wants disclosures that are already available to him. The case law is clear that this Court should not put its thumb on the scale in a shareholder vote by permitting a single shareholder parroting the already-disclosed narrative of a losing bidder to cause unnecessary delay.

Because any delay in the shareholder vote would result in significant hardship and expense to TWO, its shareholders and employees, and the counterparties in the proposed transaction, if this Court is inclined to grant any injunctive relief, it should require Plaintiff to post a substantial bond in an amount that covers the potential incidental and consequential costs as well as the losses TWO will suffer.

**FACTUAL AND PROCEDURAL BACKGROUND**

A. **Relevant Entities**

Defendant TWO, a real estate investment trust, is a publicly traded Maryland corporation headquartered in St. Louis Park, Minnesota. Compl. ¶ 23. It invests in mortgage servicing rights and residential mortgage-backed securities. *Id*. CrossCountry Intermediate Holdco, LLC ("CCM") is a private Delaware limited liability company headquartered in Cleveland, Ohio. Pl. Ex. 1, ECF No. 2-3 at 16 ("April 20, 2026 Def. Proxy"). UWMC Holdings Corporation

3

("UWMC") is a publicly traded Delaware corporation headquartered in Pontiac, Michigan. *Id*. at 29. UWMC and CCM both bid to acquire TWO. *Id*. at 23–39.

### B. The Sale Process

Beginning in December 2024 and continuing into 2026, TWO's Board considered a series of unsolicited acquisition proposals from UWMC, CCM, and other parties to acquire TWO. Compl. ¶ 34; April 20, 2026 Def. Proxy at 23–34. Because TWO is a publicly traded company, it is required to file proxy statements with the SEC so that its stockholders can make an informed decision ahead of a vote to approve a transaction. Here, TWO filed a definitive proxy statement on April 20, 2026, and filed additional definitive proxy materials on April 29, May 1, May 4, May 6, May 8, May 11, May 13, May 14, and May 15, 2026.[2] In each of these proxy statements, TWO—assisted by outside counsel and independent financial advisors, including Houlihan Lokey—described the competing bids, identified the negotiated terms, and made an ultimate determination that a merger with CCM (the "CCM Merger") was the best available transaction for TWO stockholders.

The facts discussed herein are taken from TWO's proxy statements. As detailed in the definitive proxy statement, from October to December 2025, both CCM and UWMC, along with other third parties, submitted multiple proposals to acquire TWO. April 20, 2026 Def. Proxy at 27–33. On December 17, 2025, the Board approved UWMC's bid. *Id.* at 33. Under UWMC's merger agreement, UWMC would acquire TWO for a fixed exchange ratio of 2.3328 shares of UWMC Class A common stock for each share of TWO common stock (the "UWMC Merger Agreement"). *Id*. As of market close on December 16, 2025, UWMC's stock was trading at $5.12

---

[2] Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction attaches as exhibits the definitive proxy statement dated April 20, 2026 and the additional definitive proxy materials filed May 4, May 6, and May 11.

per share, implying a per share valuation of $11.94 of TWO. Compl. ¶ 35. The UWMC Merger Agreement provided that TWO could terminate the UWMC agreement to enter into a different agreement that arose from an unsolicited "Company Superior Proposal" to acquire TWO. Compl. ¶ 35. A "Company Superior Proposal" was defined as:

> A proposal "which the Company Board or any committee thereof determines in good faith after consultation with the Company's outside legal and financial advisors and after taking into account the factors that the Company Board consider pertinent (including legal, financial, regulatory and other aspects of such proposal, including whether the transactions contemplated by such proposal are reasonably capable of being consummated) would, if consummated in accordance with its terms, result in a transaction more favorable to the Company Stockholders than the [UWMC Merger Agreement]." Dft. Ex. 4 February 12, 2026 Definitive Additional Proxy on Schedule 14A at A-3 to A-4 ("February 12, 2026 Def. Proxy").[3]

Later in the day on December 17, 2025, CCM submitted an unsolicited offer letter to TWO containing a revised acquisition proposal. April 20, 2026 Def. Proxy at 33. A few days later, on December 21, 2025, CCM informed Houlihan Lokey that CCM would not pursue an acquisition of TWO. *Id*. at 34.

From December 17, 2025 to March 17, 2026, UWMC's share price had declined from $5.12 to $3.66. *Id*. at 32, 34. The implied value of the UWMC merger consideration under the UWMC Merger Agreement had thus declined by 29%—from $11.94 to approximately $8.54 per share. *Id*. at 34. On March 16, 2026, TWO adjourned its special meeting of stockholders to approve the UWMC Merger Agreement at the request of UWMC to provide additional time for stockholders to vote and to solicit additional proxies to vote in favor of TWO's acquisition by UWMC. The special meeting was scheduled to take place on March 24, 2026. April 20, 2026 Def. Proxy at 34. On March 17, 2026, however, CCM submitted an unsolicited proposal letter to

---

[3] The Original CCM Merger Agreement (defined herein) would later include an identical definition of "Company Superior Proposal. May 4, 2026 Proxy Addition.

acquire TWO for $10.70 per share in cash. *Id*. at 34. Given these circumstances, the Board determined that the March 17, 2026 CCM proposal could reasonably be expected to lead to a "Company Superior Proposal," which enabled TWO, under the UWMC Merger Agreement to engage in discussions and negotiations with CCM on its unsolicited competing proposal under the terms of the UWMC agreement. *Id*. On March 20, 2026, the Board determined that the March 17, 2026 CCM proposal constituted a "Company Superior Proposal," including because it offered shareholders $10.70 per share in cash, whereas the UWMC agreement offered shareholders stock trading at $8.54 per share. *Id*. That same day, UWMC submitted a revised proposal letter claiming to offer aggregate cash and stock consideration of $10.71 pursuant to a deal structure where UWMC would add an additional cash amount to the stock consideration which was capped under a complicated formula involving UWMC's share price would lead to less than $10.70 per share being received at closing. *Id*. UWMC submitted an updated proposal on March 22, 2026 with the same financial terms. *Id*. at 36.

On March 24, 2026, CCM increased its offer to $10.80 per share in cash. *Id*. That same day, UWMC submitted a revised proposal letter claiming to offer aggregate cash and stock consideration of $10.95 pursuant to another complicated formula, but still could not guarantee a price of more than $10.80 per share being received at closing, which could continue to fluctuate based on the market conditions. *Id*. at 37. The amount of the cash consideration was determined based on trading prices preceding the closing date.

The Board met to discuss the competing CCM and UWMC offers on March 25, 2026. *Id*. Houlihan Lokey opined that the most recent UWMC proposal was subject to uncertainty given the stock portion of the consideration and that, based on its analysis at simulated closing dates, the UWMC consideration would be worth less than the $10.80 per share cash consideration from

6

CCM. *Id*. The Board met again on March 26, 2026, and Houlihan Lokey rendered an oral fairness opinion (confirmed in writing) that the March 24, 2026 CCM proposal was fair to TWO common stockholders. *Id*. at 38. The Board determined that the March 24, 2026 CCM proposal was a "Company Superior Proposal" and decided to terminate the UWMC Merger Agreement, enter into the transaction with CCM, and recommend the CCM transaction to stockholders. *Id*. at 38–39. In making this decision, the Board considered, among other things, the certainty of value provided by the CCM transaction, CCM's committed financing, the absence of any financing condition from CCM, the total value of the consideration, and the uncertain value of the UWMC offer discussed at the March 25, 2026 meeting. *Id*. at 38. On March 27, 2026, TWO and CCM executed a merger agreement (the "Original CCM Merger Agreement") and TWO delivered a notice of termination to UWMC terminating the UWMC Merger Agreement. *Id*. at 39. CCM paid UWMC the $25.4 million termination fee required under the UWMC Merger Agreement on behalf of TWO. *Id*. TWO scheduled a special stockholder's meeting to vote on the Original CCM Merger Agreement for May 19, 2026. Compl. ¶ 41.

On April 20, 2026, UWMC submitted an unsolicited proposal to the Board. Pl. Ex. 2 at 7 ECF No. 2-4 ("May 4, 2026 Proxy Addition"). Under this proposal, TWO shareholders would receive 2.3328 shares of UWMC Class A Common Stock per share of TWO common stock (the same ratio as in the terminated UWMC Merger Agreement). Alternatively, if affirmatively and timely elected, a TWO stockholder could receive cash consideration of $11.30 per share. *Id*. Based on UWMC's share price that day, TWO stockholders who failed to affirmatively and timely elect the cash consideration would receive an implied value of $9.14 per share, significantly less than the $11.30 cash alternative offered by the CCM Merger Agreement. *Id*.

The Ad Hoc Committee, formed to oversee merger proposals, met on April 22, 2026 to discuss the April 20, 2026 UWMC proposal. *Id*. at 8. It noted the significant disparity between the implied value of the default stock consideration proposed under the April 20 UWMC Proposal and the $11.30 per share cash election, which raised questions about the value of the stock being offered and the need to understand UWMC's strategic rationale for the transaction. *Id*. It also discussed how the April 20, 2026 UWMC proposal contemplated substantial changes from both the CCM Merger Agreement and the UWMC Merger Agreement and that certain of the proposed changes appeared to impair the ability of TWO to continue the operation of its business prior to closing, to respond to competing proposals, and to satisfy the conditions to closing. *Id*. But because the Ad Hoc Committee determined that it did not currently have sufficient information to determine whether the April 20 UWMC Proposal was, or could reasonably be expected to lead to, a "Company Superior Proposal," it instructed TWO management and TWO's legal and financial advisors to submit clarifying questions to UWMC in order to obtain additional information. *Id*. UWMC answered these questions on April 24, 2026. *Id*.

On April 27, 2026, CCM submitted a proposed amendment to the Original CCM Merger Agreement increasing the consideration from $10.80 per share to $11.30 per share in cash. *Id*. The proposed amendment also increased the termination fee from $25.4 million to $50 million. *Id*. Also on April 27, 2026, the Ad Hoc Committee met to discuss the April 20, 2026 UWMC proposal, UWMC's responses to TWO's questions, and CCM's proposed amendment to the Original CCM Merger Agreement. *Id*. at 9. The Ad Hoc Committee discussed several concerns with the April 20, 2026 UWMC proposal, including the consideration structure whereby stockholders who did not affirmatively elect to receive cash would only receive UWMC stock valued at approximately $8.72 per share of TWO common stock, which was materially less than

the $11.30 per share currently offered by CCM. *Id*. at 9. The Ad Hoc Committee also discussed concerns that a transaction with UWMC could not close as quickly as UWMC anticipated due to regulatory approval timelines, the fact that UWMC's financing was subject to a lender due diligence condition, the termination fee proposed by UWMC, and UWMC's strategic rationale given their recent statements that there were no operational efficiencies to gain from a transaction with TWO. *Id*. The representatives of Houlihan Lokey stated that, given the implied value of the stock component of the April 20 UWMC Proposal (based on the closing price of UWMC Class A Common Stock), the fact that the stock component of the consideration offered under the April 20 UWMC Proposal was the default consideration, and information available at the time, they did not believe Houlihan Lokey would be in a position to render a fairness opinion with respect to a transaction on the terms of the April 20 UWMC Proposal in its then-current form. *Id*. The Ad Hoc Committee also discussed CCM's proposed $11.30 per share in cash amendment. *Id*. at 10. The Ad Hoc Committee unanimously determined that the April 20, 2026 UWMC proposal did not constitute, and could not reasonably be expected to lead to, a "Company Superior Proposal" and determined to recommend to the Board that the Board approve the Amendment to the Original CCM Merger Agreement. *Id*.

On April 28, 2026, the Board met to consider the competing UWMC and CCM proposals. *Id*. The Board discussed the proposals, including (i) the certainty of value provided by CCM's all-cash consideration of $11.30 per share, as compared to the default stock consideration structure offered by UWMC, where non-electing stockholders received UWMC Class A Common Stock with an implied value of approximately $8.72 per share; (ii) the committed financing secured by CCM compared to UWMC's financing commitment letter, which contained a lender due diligence condition; (iii) the terms and conditions of UWMC's proposed merger agreement, which the Board

9

viewed as creating business continuity risks and restricting the Company's ability to respond to in-bound proposals and to satisfy closing conditions; (iv) the termination payment structure of the proposals; (v) the execution risk associated with terminating the Original CCM Merger Agreement to pursue a transaction with UWMC, including the need to refile certain regulatory approvals, prepare and file new proxy and registration statements, and resolicit stockholders; and (vi) UWMC's strategic rationale given their recent statements that there were no operational efficiencies to gain from a transaction with TWO. *Id*. at 11.  Houlihan Lokey again stated that, given the implied value of the stock component of the April 20 UWMC Proposal (based on the closing price of UWMC Class A Common Stock), the fact that the stock component of the consideration offered under the April 20 UWMC Proposal was the default consideration, and information available at the time, they did not believe Houlihan Lokey would be in a position to render a fairness opinion with respect to a transaction on the terms of the April 20 UWMC Proposal in its then-current form. *Id*. at 11.  Houlihan Lokey then orally rendered its opinion to the Board (confirmed in writing) as to, as of such date, the fairness, from a financial point of view, to the holders of TWO Common Stock of the CCM Merger Consideration of $11.30 per share in cash to be received by such holders in the CCM Merger pursuant to the CCM Merger Agreement. *Id*.  The Board unanimously determined that the April 20, 2026 UWMC proposal did not constitute a "Company Superior Proposal" and approved the execution of the amendment to the Original CCM Merger Agreement. *Id*. at 12.

On April 30, 2026, UWMC submitted to the Board another unsolicited revised proposal raising the cash option of its offer to $12.00 per share but maintaining the same default stock consideration with the same fixed exchange ratio previously offered. *Id*.  UWMC's financing commitment letter included a due diligence condition, permitting the lender to terminate if not

satisfied with diligence. *Id.* The Ad Hoc Committee met on May 1, 2026 to consider the April 30, 2026 UWMC proposal. *Id.* After considering the same concerns previously identified in connection with the April 20 UWMC Proposal, none of which were remedied by the April 30 UWMC proposal, the Ad Hoc Committee determined that the April 30 UWMC Proposal was not, and could not reasonably be expected to lead to, a "Company Superior Proposal." *Id.* Jilted by this rejection, on April 30, 2026 UWMC issued a press release stating that UWMC believed its offer to be superior, that the CCM termination fee "hinders" the ability to realize full value, and the Board did not appreciate the value of UWMC's stock as deal consideration. Pl. Ex. 4, ECF No. 2-6.

The Board met on May 3, 2026 to consider the April 30 UWMC proposal. The Board discussed a number of risks and concerns with the April 30, 2026 UWMC Proposal, including risks related to UWMC's ability to consummate the proposed transaction, risks related to TWO's ability to continue to operate its business during the pendency of a merger with UWMC and the potential adverse effects on TWO's business if such a transaction were to fail to close. Following discussion, and in consultation with its legal, financial and strategic advisors and taking into account the recommendation of the Ad Hoc Committee, the Board unanimously determined that the April 30, 2026 UWMC proposal was not, and could not reasonably be expected to lead to, a "Company Superior Proposal." *Id.* at 13.

On May 7, 2026, TWO entered into a Second Amendment to the Original CCM Merger Agreement that increased the acquisition price from $11.30 per share in cash to $12.00 per share in cash. Dft. Ex. 1, May 11, 2026 Definitive Additional Proxy on Schedule 14A at 1, 4 ("May 11, 2026 Proxy Addition"). On May 11, 2026, UWMC increased the cash election portion of its offer from $12.00 to $12.50 per share while preserving the same default stock consideration with the

11

same fixed exchange ratio for stockholders who did not elect to receive cash. Compl. ¶ 55. The Board unanimously rejected the May 11, 2026 UWMC proposal after careful consideration with its financial and legal advisors. Dft. Ex. 2, May 13, 2026 Definitive Additional Proxy on Schedule 14A at 2 ("May 13, 2026 Proxy Addition").

On May 6, 2026 TWO filed a Definitive Additional Proxy that detailed its rationale for recommending the CCM Merger to stockholders. Pl. Ex. 3, ECF No. 2-5 ("May 6, 2026 Proxy Addition"). TWO noted that it evaluated many proposals from UWMC, with "at least 10 proposals/revisions." May 6, 2026 Proxy Addition at 12. TWO recommended the CCM Merger for, among other reasons, the certain value of the all cash consideration, fully committed financing, and progress toward closing. *Id.* at 5. That same day, UWMC held a quarterly earnings call at which UWMC CEO, Matthew Ishbia, made many of the statements cited by the Complaint. Pl. Ex. 6, ECF No. 2-8. In this call, Mr. Ishbia stated that he was "not … impressed" with TWO management and did not see synergies from the deal. *Id.* at 3. He also inaccurately alleged that TWO "went out and tried to get another bid" after signing with UWMC and that TWO "never engaged" with UWMC. *Id.* at 3-4.

On May 13, 2026, before the Complaint was filed in this action, TWO filed a press release which explained several "core deficiencies" with UWMC's proposal: (1) stockholders who do not elect to receive cash would only receive $7.58 worth of UWMC stock at current market prices, disadvantaging TWO's retail shareholders who may not elect to receive cash; (2) the latest UWMC proposal was not accompanied by an increased financing commitment letter, calling into question UWMC's financial condition; (3) UWMC's lack of explanation for how it plans to close within 60 days given required regulatory approvals; (4) UWMC's false statements that TWO management has ulterior motives for the CCM transaction of securing future employment, when in truth, no

12

member of the TWO Board is expected to continue with the combined company, and no offers of employment have been made to, nor have any discussions taken place regarding employment of, any TWO named executive officer —whether in a deal with CCM or UWMC.  May 13, 2026 Proxy Addition at 2-4.

On May 14, 2026, UWMC filed a Definitive Proxy Statement regarding the stockholder vote on the CCM Merger.  Dft. Ex. 3, May 14, 2026 UWMC Proxy ("UWMC Proxy").  The UWMC Proxy disclosed UWMC's positions on the CCM Merger and stockholder vote, including (incorrect) allegations that the CCM merger is "inferior" to the UWMC proposal (UWMC Proxy at 1), TWO committed a "willful breach of contract" (*id*. at 17), UWMC has greater certainty of a deal closing (*id*. at 9), the Board and management generally sought to "entrench" themselves with the CCM Merger termination fee and a lack of engagement with UWMC (*id*. at 13–14) (despite the fact that UWMC proposed a substantially similar termination fee structure, *see* May 4, 2026 Proxy Addition at 9), and that the CCM Merger would pay TWO management cash payouts of $35 million (*id*. at 21).

On May 15, 2026, TWO filed a Definitive Additional Proxy that disclosed to stockholders the Complaint and the UWMC Proxy, incorporating the entirety of both documents by reference. Dft. Ex. 5, May 15, 2026 Definitive Additional Proxy on Schedule 14A ("May 15, 2026 Proxy Addition"). .

## C.  This Litigation

Plaintiff filed the Complaint (ECF No. 1) on May 13, 2026, alleging that Defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act by omitting material information from the Proxy, rendering it false and misleading.  Compl. ¶¶ 79–90.  On the same day, Plaintiff also filed his Motion for a Temporary Restraining Order and Preliminary Injunction (the "Motion")

13

seeking to enjoin Defendants from holding the scheduled May 19, 2026 stockholder vote until Defendants make supplemental disclosures to the Proxy.  ECF Nos. 2, 2-2.

## LEGAL STANDARD

TROs and preliminary injunctions "are extraordinary remedies involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 1991) (quotation marks omitted). "The standard for a temporary restraining order is the same as a preliminary injunction." *Maages Auditorium v. Prince George's Cnty., Md.*, 4 F. Supp. 3d 752, 760 n. 1 (D. Md. 2014), *aff'd* 681 F. App'x 256 (4th Cir. 2017).  To obtain either form of relief, the plaintiff must "establish (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  "[P]laintiff bears the burden of establishing that each of these factors supports granting the injunction." *Gilead Scis., Inc. v. Meritain Health, Inc.*, 2025 WL 1745669, at \*5 (D. Md. June 24, 2025) (Rubin, J.) (*quoting Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991)).  And because preliminary injunctions and TROs are "extraordinary remed[ies] never awarded as of right," they may only be awarded upon a "clear showing" that a plaintiff is entitled to such relief.  *Winter*, 555 U.S. at 22-24.[4]

---

[4] Plaintiff argues (at 3) that the "Fourth Circuit applies a sliding-scale approach under which the strength of the likelihood-of-success showing required is informed by the balance of hardships." After the Supreme Court's decision in *Winter*, however, the Fourth Circuit expressly invalidated its sliding-scale approach and held that it "may no longer be applied in granting or denying preliminary injunctions in the Fourth Circuit." *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 347 (4th Cir. 2009), *cert. granted, judgment vacated*, 559 U.S. 1089 (2010); *see also Cytimmune Scis., Inc. v. Paciotti*, 2016 WL 4699417, at \*2 (D. Md. Sept. 8, 2016) (recognizing Fourth Circuit's abrogation of prior precedent and requirement, post-*Winter*, that "plaintiff must … satisfy each requirement as articulated").

## ARGUMENT

This Court should deny Plaintiff's request for a temporary restraining order and preliminary injunction barring Defendants from holding a long-awaited shareholder vote on the proposed transaction.  Not only has Plaintiff fallen far short of satisfying any of the prongs necessary to secure the extraordinary remedy he seeks, his Complaint should be dismissed.

**I.    Plaintiff's Motion Should Be Denied Because Plaintiff Cannot Satisfy the High Standard for His Requested Relief.**

**A.    Plaintiff Has No Likelihood of Success on the Merits.**

Plaintiff's Complaint and TRO Motion are mainly premised on an alleged violation of Section 14(a) of the Securities and Exchange Act.  That section makes unlawful the solicitation of a proxy regarding any security, by way of interstate commerce, in contravention of the rules and regulations prescribed by the SEC.  15 U.S.C. § 78n(a).  As relevant here, SEC Rule 14a-9 prohibits "any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

"To prevail in a private cause of action asserting a violation of Rule 14a-9, a plaintiff must show that (1) the proxy statement contained a material misrepresentation or omission (2) that caused the plaintiff injury and that (3) the proxy solicitation was an essential link in the accomplishment of the transaction."  *Hayes v. Crown Cent. Petroleum Corp.*, 78 F. App'x 857, 861 (4th Cir. 2003).  With respect to materiality, "a misrepresentation or omission is material if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by a reasonable investor as having significantly altered the total mix of information made available."  *Id.* (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).  "Inaccurate statements"

15

or "omit[ted] information" do not render a proxy statement unlawful; rather, a proxy is "unlawful only if, by what it states or omits, it contains misleading information." *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 2018 WL 1535496, at \*4 (D. Md. Mar. 28, 2018), *aff'd*, 918 F.3d 312 (4th Cir. 2019); *see also In re Willis Towers Watson plc Proxy Litig.*, 937 F.3d 297, 307 (4th Cir. 2019) ("To form the basis of a cause of action, the statement must be false, or the omission must render public statements misleading.") (emphasis and internal quotation marks omitted).  In making this determination, the Court must "tease out information critical to an informed decision by a stockholder from that which would simply be nice to know." *Malon v. Franklin Fin. Corp.*, 2014 WL 6791611, at \*6 (E.D. Va. Dec. 2, 2014)

Moreover, in order to state a claim for a Section 14(a) violation, the Complaint must satisfy the strictures of the Private Securities Litigation Reform Act of 1995 ("PSLRA").  The PSLRA requires that the Complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1)(B).  Failure to meet these "heightened pleading requirements" results in dismissal of the case.  *Hayes*, 78 Fed. App'x at 861.

The gist of Plaintiff's request for relief is that four categories of information are necessary "to ensure an informed shareholder vote instead of one impaired by irreconcilable narratives among competing corporate boards."  Compl. ¶ 4.  But Plaintiff cannot demonstrate a likelihood of success in connection with any of his alleged omissions because the information he cites has already been disclosed to TWO's shareholders or consists of mischaracterizations that represent

16

his subjective interpretation of facts already disclosed.  Far from being entitled to extraordinary relief, Plaintiff's allegations demonstrate that this case should be dismissed.[5]

### 1.  The Proxy Statements Did Not Omit or Misrepresent Any Information.

#### a.  The April 20, 2026 Proxy Disclosed that the CCM Deal Was Unsolicited and Defendants Have No Duty to Disclose Unsubstantiated Allegations.

Plaintiff first takes issue with TWO's alleged failure to disclose that "UWMC's CEO publicly accused the Company of improperly soliciting CrossCountry in derogation of the No-Shop."  Pl. Mem. in Supp. of Mot. for Prelim. Inj. ("Assad Brief") at 5; *see also* Compl. ¶¶ 13, 59 The No-Shop provision is set forth in Section 6.3 of the UWMC Merger Agreement.  February 12, 2026 Definitive Proxy at A-3 to A-4.  It states that TWO will not "initiate, solicit, propose or induce or knowingly encourage, facilitate or assist" another party in making an offer to acquire TWO.  *Id*. at A-4.  UWMC's CEO said something different.  He questioned "[w]hether it was appropriate or not" that TWO "went out and tried to get another bid."  Compl. ¶ 58.

In any event, Plaintiff's allegation is plainly contradicted by the April 20, 2026 Proxy.  In that Proxy, TWO explained that "[o]n March 17, 2026, CCM submitted an *unsolicited proposal letter* to TWO to acquire 100% of the equity interests in TWO."  April 20, 2026 Def. Proxy at 34 (emphasis added).  The Proxy thus speaks directly to how CCM's offer arose, and confirms that it was unsolicited.

Fundamentally, Plaintiff seeks to require TWO to disclose an unsubstantiated allegation from the disgruntled CEO of a competing bidder.  But Plaintiff cites no authority requiring such a

---

[5] Because Plaintiff "fails to state a cause of action against director defendants under Section 14(a) of the Exchange Act and SEC Rule 14a-9 …, there is no primary violation on which a Section 20(a) claim can be premised."  *Kugelman v. PVF Capital Corp.*, 972 F. Supp. 2d 993, 1000 (N.D. Ohio 2013).  Accordingly, the Section 20(a) claim fails as well.  *Svezzese v. Duratek, Inc.*, 67 Fed. App'x 169, 174 (4th Cir. 2003)

disclosure. In fact, the law says the opposite. "Liability under Rule 14a-9 is predicated upon a showing that an allegedly omitted fact is true." *United States v. Matthews*, 787 F.2d 38, 45 (2d Cir. 1986). Accordingly, a "company has no duty to disclose to shareholders unsubstantiated allegations." *Bolger v. First State Fin. Servs.*, 759 F. Supp. 182, 194 (D.N.J. 1991); *see also In re Browning-Ferris Indus., Inc. S'holder Derivative Litig.*, 830 F. Supp. 361, 368 (S.D. Tex. 1993) ("plaintiffs cannot state a section 14(a) claim based on the failure to reveal plaintiff['s] demand [to pursue legal claims] and the Board's subsequent investigation into that demand"), *aff'd sub nom. Cohen v. Ruckelshaus*, 20 F.3d 465 (5th Cir. 1994). And, in any event, UWMC's CEO made these allegations publicly, so further disclosure of these same allegations would not "significantly alter[] the total mix of information made available." *Hayes*, 78 F. App'x at 861 (citing *TSC Indus.*, 426 U.S. at 449). Plaintiff's attempt to manufacture liability on unsupported allegations fails as a matter of law.

### b. The Proxy Filings Present Detailed Information of Executive Compensation and Shareholder Value.

Plaintiff next takes issue with what he views as a discrepancy between the compensation and benefits TWO's executives will receive under the CCM deal and what they would have received under the UWMC deal. Compl. ¶¶ 60-69. Relying once again on a disgruntled bidder's public statements, Plaintiff contends that the Board's decision to move forward with the CCM offer is the "product of entrenchment—i.e., the directors and senior officers' interests in keeping their jobs and crystallizing their compensation." Compl. ¶ 61. Plaintiff premises Defendants' liability on his allegation that the "Proxy does not address that allegation by disclosing the underlying facts that would allow stockholders to evaluate it." *Id.* In particular, Plaintiff claims that TWO should have disclosed "(i) whether any director or officer has received or negotiated for a post-closing role under CrossCountry; (ii) the $35 million figure UWMC has publicly identified

18

as the aggregate amount of immediate management payouts accelerated by the CrossCountry deal; or (iii) the significance of the asymmetry between accelerated cash payouts under CrossCountry and the possibility that UWMC would not extend replacement awards." *Id*. Each of these points, however, was fully addressed in TWO's Proxy statements and TWO is under no obligation to provide an (incorrect) characterization of how these terms inure to the benefit of its executives.

As the Second Circuit has explained, "[a] proxy statement need not disclose the underlying motivations of a director or major shareholder *so long as* all the objective material facts relating to the transaction are disclosed." *Mendell v. Greenberg*, 927 F.2d 667, 674 (2d Cir. 1990), *amended*, 938 F.2d 1528 (2d Cir. 1990); *see also Freer v. Mayer*, 796 F. Supp. 89, 92 (S.D.N.Y. 1992) ("There is no requirement that directors reveal the rationale for a business transaction described in a proxy."). "To recognize liability on mere disbelief or undisclosed motive without any demonstration that the proxy statement was false or misleading about its subject would authorize § 14(a) litigation confined solely to ... the 'impurities' of a director's 'unclean heart.'" *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1096 (1991).

In *Freer v. Mayer*, for example, the court was confronted with a shareholder derivative action asserting that the proxy statement issued for a director election violated Section 14(a) because it "failed to disclose the business purpose justifying the making of the Retirement Agreement" for the outgoing CEO. 796 F. Supp. at 91-92. Plaintiff's position was that the "shareholders needed to know the directors' reasons for executing the Retirement Agreement so that in casting their votes, the shareholders understood the directors' view of their fiduciary obligations." *Id.* at 92. The court disagreed. It found that the company's annual report, the original proxy, and a supplemental letter "revealed all of the important terms of the Retirement Agreement in addition to the terms of Mr. Mayer's Employment Agreement so that comparisons could be

19

made." *Id.* at 92-93. As the court explained, "[o]ther than revealing their reasons for entering into this agreement, there was nothing more to disclose about the transaction. Any negative inferences regarding the wisdom of this 'golden parachute' could easily be drawn by the shareholder from the available information." *Id.* at 93. If the shareholder believed that the execution of the Retirement Agreement "was a business decision which reflected poorly on a particular director, he or she could vote against the director's election." *Id.* But the "directors were under no duty to disclose their motives, either pure or unclean, so long as all of the information concerning the deal was revealed in the supplemental proxy." *Id.*

The same is true here: the Proxy and its supplements disclosed all of the objective facts that Plaintiff claims are missing. *First*, on May 13, 2026, before Plaintiff filed the Complaint and Motion for a TRO and Preliminary Injunction, TWO made a supplemental proxy filing and disclosed that "no member of the TWO Board is expected to continue with the combined company, and no offers of employment have been made to, nor have any discussions taken place regarding employment of, any TWO named executive officer—whether in a deal with CCM or UWMC." May 13, 2026 Proxy Addition at 4.

*Second*, the Proxy provides a comprehensive explanation of executive compensation consisting of (a) equity awards that vest upon a change of control, (2) cash severance payable upon change of control and termination, and (3) golden parachute payments. May 11, 2026 Proxy Addition at 15-17. The sum total of these payments amount to $35,400,767 for the named executive officers. *Id*. at 16. And while Plaintiff suggests (Assad Br. at 6) that executives will receive "immediate management payouts," the Proxy makes clear that cash severance payments are only payable upon termination. *Id*. The cash severance payments are pursuant to a severance

20

plan that had been in place prior to the original UWMC merger agreement and that would apply to any transaction where the executives are terminated, whether with CCM or UWMC.

*Finally*, Plaintiff is wrong that TWO did not disclose the differences between the equity awards under the two competing proposals. Indeed, Plaintiff admits that the "Proxy discloses that UWMC's April 20 Proposal would have replaced the acceleration of TWO equity awards with replacement awards of UWMC stock." Compl. ¶ 65. Plaintiff complains that "the Proxy does not disclose why that distinction matters." *Id.* But it was not required to render a business judgment, or explain why, one award was better than the other. *Supra* 19-20. And in any event, TWO explained what made the CCM deal more attractive to shareholders generally. The proxy statements disclose the main difference between the two proposals. Specifically, under UWMC's proposal, the equity awards of directors and officers are converted to equity awards for UWMC shares, May 4, 2026 Proxy Addition at 22–23 , at a rate of 2.3328 UWMC shares per 1 TWO share, subject to continued time vesting and without the option to elect the UWMC cash consideration. Under CCM's proposal, directors and officers receive cash payments at closing in amounts equal to the number of shares subject to the equity awards multiplied by the cash-per-share merger consideration, which is the same formula used for ordinary stockholders. May 11, 2026 Proxy Addition at 14.

This is not a situation where, as Plaintiff suggests (Assad Br. at 6), Defendants issued a proxy with "inaccurate" statements requiring correction. *Lone Star Steakhouse & Saloon, Inc. v. Adams*, 148 F. Supp. 2d 1141, 1152-54 (D. Kan. 2001). To the contrary, TWO's disclosures provided shareholders with everything they needed to make an informed decision about whether to accept or reject CCM's merger agreement (the only proposal currently on the table). Plaintiff fails to identify what additional information he believes is lacking, or that Defendants had a duty

21

to disclose the unidentified information. *In re Siliconix Inc. S'holders Litig.*, 2001 WL 716787, at *9 (Del. Ch. June 19, 2001) (defendants were under no obligation to "disclos[e] all available information simply because available information might be helpful").

### c.    The Proxy Disclosed and Described the Termination Fee.

Plaintiff's termination fee assertions are similarly flawed. (Assad Br. at 7). This time, Plaintiff acknowledges that the Proxy disclosed that the Board considered the increase of the Company Termination Fee from $25.4 million to $50 million and described the structure as "level[ing] the playing field for all potential bidders." Compl. ¶ 70. Plaintiff is incorrect that TWO received nothing of value in exchange for this higher termination fee. The first amendment to the CCM Merger that included the $50 million termination fee also included the increased consideration from CCM and a new closing condition favorable to TWO that conditioned TWO's requirement to close on business permits associated with mortgage origination and servicing businesses being obtained. May 4, 2026 Proxy Addition at 28, A-2. This term was added "for the benefit of TWO." *Id.* at 5.

Nevertheless, Plaintiff now claims that TWO's disclosures on the termination fee are "materially misleading" because they were characterized "as an ordinary business-judgment rather than an asymmetric deal-protection giveaway." (Assad Br. at 7). But just because Plaintiff disagrees about the inherent value of a term does not mean that the Proxy statement is inaccurate. To be clear, "[a] proxy statement need not negatively characterize all the facts that are disclosed or expressly verbalize all adverse inferences from those facts." *Kahn v. Wien*, 842 F. Supp. 667, 676 (E.D.N.Y.), *aff'd*, 41 F.3d 1501 (2d Cir. 1994). "[N]or do they require disclosure of one's opponent's characterization of the facts." *Bertoglio v. Texas Int'l Co.*, 488 F. Supp. 630, 649 (D. Del. 1980). So long as the "objective material facts relating to the transaction are disclosed," the disclosure is valid. *Mendell*, 927 F.2d at 674.

22

### d.    The Proxy Statements Disclosed All of TWO's Dealings with UWMC.

Plaintiff ends with his unsupported and factually inaccurate theory that the Board "declined to counter, negotiate, or engage on the terms" of the UWMC deal, making TWO's representation that it "thorough[ly]" engaged with UWMC "misleading."  Assad Br. at 7-8.  The Proxy and its supplements include many pages evaluating UWMC's proposals, identifying specific structural defects (such as that the timelines for regulatory approval were longer), and explaining that UWMC's stock had declined approximately 29.5% since the original merger agreement thereby eroding the value of UWMC's consideration.  April 20, 2026 Def. Proxy at 38.  The Board communicated its concerns to UWMC, and UWMC had ample opportunities to improve its offer. *See* May 4, 2026 Proxy Addition at 8.

Plaintiff has failed to allege what made any of these statements false or misleading; indeed, he largely pretends they do not exist.  And to the extent that Plaintiff seeks to impose liability for the Board describing its interactions with UWMC as "thorough" and "exhaustive," those statements represent mere "puffery and opinion that is not actionable."  *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 543 F. Supp. 3d 96, 117 (D. Md. 2021) (describing statements that the merger was "99.9 percent successful" and that defendant was "in the home stretch on integrating the companies and are pleased with the results" as "not actionable"), *aff'd sub nom. In re Marriott Int'l, Inc.*, 31 F.4th 898 (4th Cir. 2022); *see also supra* 22 (explaining that disclosures do not need to adopt an opponent's characterization of the facts).[6]

---

[6] Nor is the Board's proffered preference for the CCM merger actionable.  An opinion statement may constitute a material misrepresentation when a complaint (a) alleges "that an opinion was wrong," and (b) "call[s] into question the issuer's basis for offering the opinion."  *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 194 (2015).  So if the Board's proffered preference for the CCM merger "is alleged to be misleading, it can only have been so if it was either 'insincere' or false."  *In re Focus Fin. Partners*, 2025 WL 961488, at *5 (D. Del. Mar. 31, 2025).  But where, as here, the Proxy is "rife with thoughtful business explanations for

**2.    Even if Plaintiff's Alleged Misrepresentations or Omissions Were Actionable, the Disclosure of the Complaint and Competing Proxy Now Require Dismissal.**

"As far as proxy statements are concerned ..., the federal purpose is served if the statement fully and fairly sets out such relevant and material facts as would enable a reasonably prudent shareholder to make an intelligent decision as to whether to grant the requested proxy or as to how he should vote on the questions mentioned in the proxy statement." *Lessler v. Little*, 857 F.2d 866, 875 (1st Cir. 1988).  To evaluate whether a proxy statement "fully and fairly sets out [] relevant and material facts," courts look to the "total mix of information made available." *Savoy v. Bos. Priv. Fin. Holdings, Inc.*, 626 F. Supp. 3d 242, 249 (D. Mass. 2022).  "The total mix of information available to a shareholder also includes information outside of the proxy statement where the information is already in the public domain and readily available to shareholders." *Id.*  So, for example, a competing proxy can become part of the "total mix" where it was "referenced in the [company's] solicitations, w[as] filed with the SEC, and w[as] readily available to shareholders through the EDGAR system on the SEC's website." *Id.* at 251.

Relatedly, courts hold that even where "the alleged material omissions and misrepresentations of the Proxy Statement violated Rule 14a-9," a defendant can "cure[] such defects in its Supplemental Proxy Statement" by "describing the legal action commenced … and the motion they brought … for a temporary restraining order." *Bolger v. First State Fin. Servs.*, 759 F. Supp. 182, 196 (D.N.J. 1991).  Under those circumstances, dismissal of the complaint is warranted. *Id.* at 198; *see also Land & Buildings Inv. Mgmt., LLC v. Taubman Centers, Inc.*, 2017 WL 3499900, at *3 (E.D. Mich. Aug. 16, 2017) (holding that because defendant "issued a supplemental proxy statement, advising shareholders of Plaintiff's lawsuit and attaching the

---

[the Board's recommendation]" and Plaintiff has pointed to no statements "that undermine the conviction" of the Board members, a Section 14a claim will not lie.

24

complaint" nine days before the shareholder annual meeting, it had "cur[ed] any deficiency in the original proxy statement" and the court would "dismiss Plaintiff's section 14(a) claim"), *aff'd*, 751 Fed. App'x 612 (6th Cir. 2018); *Topley v. SemGroup Corp.*, 2021 WL 1172622, at *3 (S.D.N.Y. Mar. 29, 2021) (plaintiffs dismissed their actions as moot after "Defendants acknowledged that seven complaints challenging the sufficiency of the disclosures made in the Proxy Statement/Prospectus … have been filed on behalf of [] stockholders").

Here, any deficiency has been cured.  On May 14, 2026, UWMC filed its own competing proxy statement under TWO's EDGAR page and sent to TWO's shareholders—raising the same points that Plaintiff says were omitted from TWO's prior Proxy filings.  Dft. Ex. 3, ("UWMC Proxy").  On May 15, 2026, TWO issued additional proxy materials incorporating (and attaching) the Complaint in this action and UMWC's competing proxy into TWO's own proxy at issue.  May 15, 2026 Proxy Addition.

The fact that these disclosures occurred four days before the vote is of no consequence. "There is no specific SEC rule dictating a particular minimum of days that must pass between a proxy and a shareholder meeting."  *Litwin v. OceanFreight, Inc.*, 865 F. Supp. 2d 385, 395 (S.D.N.Y. 2011).  How many days is appropriate is a "delicate tradeoff … on the one hand, the longer the interval between mailing a proxy solicitation and the shareholders' meeting the more time shareholders have to consider the solicitation carefully.  On the other hand, the longer the interval the likelier the proposed transaction is to fall apart."  *Beck v. Dobrowski*, 559 F.3d 680, 686 (7th Cir. 2009).  And of course, one must consider the "electronic revolution, as a result of which financial like other information spreads far more rapidly than it used to."  *Id.* (finding three days between notice of final offer and a vote sufficient, noting that "if the plaintiff prevailed in this suit, he would have succeeded in sinking the process of corporate acquisition into a sea of

25

molasses by requiring that every fresh offer to buy a company reset the clock for shareholder approval"). Here, four days is eminently reasonable given (1) TWO "re-disclosed" information that had already been provided publicly, and (2) TWO only received UWMC's proxy and Plaintiff's Complaint the day before it disclosed them. Indeed, Plaintiff will be hard pressed to say that shareholders cannot digest an amended or supplemental proxy in four days, given UWMC issued its competing proxy only one day before TWO's disclosure. All of the information that Plaintiff claims is relevant has now been disclosed with sufficient time for shareholders to review. Accordingly, the instant motion must be denied and the case dismissed.

### B. Plaintiff Cannot Demonstrate Irreparable Harm.

Because Plaintiff cannot show a likelihood of success on the merits, his Motion fails at the outset. *Gilead Scis., Inc.*, 2025 WL 1745669, at *5. But even if Plaintiff could make that showing, he must also "make a clear showing that [he] is likely to be irreparably harmed absent injunctive relief." *See Parshall*, 2017 WL 3130479, at *3 (citing *Winter*, 555 U.S. at 20-22). While Plaintiff claims that a "stockholder who votes on the basis of an incomplete proxy … cannot be made whole by monetary damages after the fact," (Assad Br. at 8) Plaintiff has not and cannot show that he will suffer any harm without a temporary restraining order or preliminary injunction.

*First*, "[c]ourts have rejected the notion that the threat of an uninformed stockholder vote constitutes irreparable harm per se." *Erickson v. Hutchinson Tech. Inc.*, 158 F. Supp. 3d 751, 760 (D. Minn. 2016). And "[c]onspicuously absent from the record is an affidavit by Plaintiff explaining how the alleged omitted disclosures would inform his vote, that he has personally read the Proxy, and that he has a fundamental understanding of the technical concepts about which he seeks further information." *Malon*, 2014 WL 6791611, at *10 n.11; *see also Parshall*, 2017 WL 3130479, at *7 ("Plaintiff has not submitted an affidavit or declaration from himself (or an expert) detailing how the omitted disclosures would inform his vote."). Without providing this (or, indeed,

26

any) evidence to the Court, Plaintiff can hardly claim that the extraordinary relief he asserts is warranted.

*Second*, to the extent that Plaintiff could demonstrate any injury at all, he has failed to demonstrate why monetary damages would not be an adequate remedy. "[M]onetary damages are regularly used to satisfy claims alleging violations of the securities laws ..." *Calleros v. FSI Int'l, Inc.*, 892 F. Supp. 2d 1163, 1174 (D. Minn. 2012) (quoting *Ryan v. CHA Enters., Inc.*, 1990 WL 58969, at *4 (S.D.N.Y. May 1, 1990)). Indeed, Plaintiff's Complaint includes an express request for "rescissory damages in the event that the CrossCountry Merger is consummated prior to entry of final judgment." *See* Compl., Prayer for Relief. "It is a fundamental principle of longstanding jurisprudence that a request for an injunction will not be granted as long as an adequate remedy at law is available." *Mach. Sols., Inc. v. Doosan Corp.*, 2015 WL 5554357, at *7 (D.S.C. Sept. 18, 2015). Here, such remedy is available.

*Finally*, the cases cited by Plaintiff are not persuasive. Assad Br. at 8. "Because not all misleading proxy statements engender the same harms," the Court must engage in a fact-specific analysis and scrutinize Plaintiffs' claims of "actual harm." *Johnson as Tr. of Johnson Fam. Tr. v. Saba Cap. Mgmt., L.P.*, 2023 WL 1345717, at *3 (S.D.N.Y. Jan. 31, 2023). In each of Plaintiff's cases, the court's determination that the defendant had in fact made misleading statements informed its determination that irreparable harm would occur if the disclosures were not amended prior to the shareholder vote. *See Dan River, Inc. v. Unitex Ltd.*, 624 F.2d 1216, 1227 (4th Cir. 1980) ("court simply cannot turn a blind eye to a potentially inaccurate filing when it possesses the injunctive power to have that filing corrected before irreparable harm occurs to the investing public"); *Allergan, Inc. v. Valeant Pharms. Int'l, Inc.*, 2014 WL 5604539, at *15 (C.D. Cal. Nov. 4, 2014) ("In the absence of a preliminary injunction requiring corrective disclosures, Allergan's

27

shareholders would face the threat of an uninformed vote on proposals to make significant changes to Allergan's corporate governance."); *Lone Star Steakhouse & Saloon, Inc. v. Adams*, 148 F. Supp. 2d 1141, 1150 (D. Kan. 2001) (holding that irreparable injury would occur where "court can prevent in advance a shareholder vote to be taken on potentially misleading and incomplete information"). There is no similar risk here.

### C. The Balance of Equities Favors Defendants, Not Plaintiff.

Even if Plaintiff could demonstrate that he would be irreparably harmed absent a preliminary injunction, the Court must still balance this harm against the significant harm that would be suffered by TWO, as well as its shareholders and employees if a preliminary injunction is issued. *Parshall*, 2017 WL 3130479, at \*3 (citation omitted). The Court must also "pay particular regard to the public consequences of employing the extraordinary relief of injunction." *Id.*

TWO faces significant harm if this lawsuit moves forward. Courts addressing similar cases have recognized that even a preliminary injunction in proxy disclosure litigation presents a "danger that shareholders may view an injunction inaccurately as a final determination of wrongdoing on the part of [the defendant]" and thereby "influence" the stockholder vote. *See Stein v. Almost Family, Inc.*, 2018 WL 1440841, at \*9 (W.D. Ky. Mar. 22, 2018); *see also Parshall*, 2017 WL 3130479, at \*8 (observing a preliminary injunction regarding a stockholder vote of a $66 million dollar merger "has the potential to be enormously disruptive and create public uncertainty regarding the entities involved").

On the other side of the ledger, the harm to Plaintiff is minimal. If the transaction was improperly consummated, Plaintiff may recover damages. And where, as here, a single plaintiff waited until the eleventh hour to enjoin the transaction, courts have regularly "recognized the harm

28

that defendants will likely suffer" outweighs the harm to the single shareholder. *Parshall*, 2017 WL 3130479, at *7.

### D.  Enjoining the Shareholder Vote Would Not Be Consistent with the Public Interest.

Finally, no public interest would be served by the issuance of a temporary restraining order or preliminary injunction or further disclosures containing information that is already disclosed. As courts have explained, "the public interest is not served by enjoining a premium generating transaction ...[;] the public interest would not be furthered by requiring disclosure of the non-material omitted information." *Stein*, 2018 WL 1440841, at *10; *Parshall,* 2017 WL 3130479, at *8.  In fact, the public interest would be disserved by disrupting a stockholder vote on an approximately $2 billion deal, causing hardship and expense to Defendants, TWO's stockholders and employees, and the other parties involved in exchange for a meaningless supplemental disclosure.

## II.  A Bond Should Be Required.

Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction should be denied.  But in the event the Court is inclined to grant any injunctive relief, a substantial bond should be required.  Federal Rule of Civil Procedure 65(c) provides that the Court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  The bond requirement is important, as it provides some recourse for a defendant who is wrongfully enjoined.  As the Fourth Circuit has observed, "[t]his rule is mandatory and unambiguous." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999).[7]

---

[7] Plaintiff suggests (at 9) that a district court may waive the bond requirement.  While Defendants acknowledge that the Fourth Circuit has said in passing that the district court "retains the discretion

In a merger case, it is appropriate for the court to consider the potential loss to stockholders of the value of their stock if the merger proves to have been erroneously enjoined. *See Shepard v. Meridian Ins. Grp., Inc.*, 137 F. Supp. 2d 1096, 1111 (S.D. Ind. 2001). Moreover, TWO is incurring, and will continue to incur, ongoing costs prior to the consummation of the deal. For these reasons, a bond of $1.9 million should be required of Plaintiff prior to the entry of any injunction. This represents 1% of the $1.9 billion total capitalization that would result from the Merger. *See* Proxy 48. This amount is well within the limits of what courts have previously required. *See, e.g.*, *Gimbel v. Signal Companies, Inc.*, 316 A.2d 599, 618 (Del. Ch. 1974) (requiring bond of 5% of the transaction value); *see also Tate & Lyle PLC v. Staley Continental, Inc.*, 1988 Del. Ch. LEXIS 61, at *29 (Del. Ch. May 9, 1988) (ordering that injunction "will be granted upon plaintiffs posting bond in the sum of $65 million"). If Plaintiff is unable or unwilling to post the required bond, the injunction request must be denied. Fed. R. Civ. P. 65(c).

## CONCLUSION

This Court should deny Plaintiff's request for a temporary restraining order.

---

to … waive the security requirement," *Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013), that statement is premised on a fundamental misreading of the Fourth Circuit's earlier precedent. *See Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999) ("Where the district court determines that the risk of harm is remote, or that the circumstances otherwise warrant it, the court may fix the amount of the bond accordingly. In some circumstances, a nominal bond may suffice."). And where "two decisions conflict, the "earlier controls." *United States v. Simmons*, 11 F.4th 239, 262 n.12 (4th Cir. 2021).

Dated: May 15, 2026

BALLARD SPAHR LLP

/s/ *WAMcDaniel, Jr.*

William Alden McDaniel, Jr.
111 S. Calvert St. 27th Floor
Baltimore, MD 21202
Telephone: (410) 528-5502
mcdanielw@ballardspahr.com

*Counsel for Defendants*

JONES DAY

*/s/ Nina Yadava*
Nina Yadava
*Pro Hac Vice Pending*
250 Vesey Street
New York, NY 10281
Telephone: (212) 326-3939
nyadava@jonesday.com

Michael McConnell
*Pro Hac Vice Pending*
1221 Peachtree St. NE #400
Atlanta, GA 30361
Telephone: (404) 771-6250
mmcconnell@JonesDay.com

*Counsel for Defendants*

31